POSTED ON WEBSITE
NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

In re                              )   Case No. 24-11015-B-11
                                   )
**PINNACLE FOODS OF CALIFORNIA LLC,**)   Docket Control No. KCO-4
                                   )
                    Debtor.        )
                                   )
_____)


**MEMORANDUM ON DEBTOR'S MOTION TO ASSUME FRANCHISE AGREEMENTS**

_____

Michael J. Berger, Law Offices of Michael J. Berger, Beverly Hills, CA, for Pinnacle Foods of California, LLC, Keith C. Owens, Craig R. Tractenberg, FOX ROTHSCHILD LLP, for Pinnacle Foods of California LLC, Movant/Debtor.

Glenn D. Moses, VENABLE, LLP, for Popeyes Louisiana Kitchen, Inc., franchisor.

Walter R. Dahl, Subchapter V Trustee.

_____

RENÉ LASTRETO II, Bankruptcy Judge:


**INTRODUCTION**

This case presents a collision between the Bankruptcy Code (11 U.S.C. § 101 et seq.), the Lanham Act (15 U.S.C. §§ 1051 et seq.), and California's Franchise Relation Act ("CFRA")(Cal. Bus. & Prof. Code §§ 2000 et seq.). The fallout is a franchisor's hypothetical lack of consent and 11 U.S.C. § 365(c)(1) leave a franchisee-debtor with restricted pathways to reorganization in the Ninth Circuit.

Pinnacle Foods of California, LLC, Debtor and Debtor-in-Possession("DIP") in the above-styled Chapter 11, Subchapter V case (the "Debtor" or "Pinnacle"), moves for an order authorizing Debtor to assume six separate franchise agreements (collectively "the Franchise Agreements") with franchisor Popeyes Louisiana Kitchen Inc. ("Popeyes"). Doc. #226.   Popeyes vigorously opposes assumption, and Pinnacle has replied. (Doc. #245 and #260).

I.

A.

Pinnacle is a franchisee of Popeyes which owns and operates a network of six Popeyes fast food restaurants.   Five in Fresno, California and one in Turlock, California under the auspices of the Franchise Agreements. Doc. #228 (Declaration of Imran Damani).   Imran Damani ("Damani") is the owner of Pinnacle and two related entities, Tyco Group LLC ("Tyco") and California QSR Management Inc. ("California QSR"), both of which are also debtor-corporations in separate Chapter 11 Subchapter V cases, but which are not implicated directly in the instant motion. Id. Collectively, Pinnacle and Tyco will be referred to as "the Franchisee Debtors" and all three entities will be referred to as "the three Debtors."   According to Damani's Declaration, Pinnacle's Chapter 11 plan and this motion to assume the Franchise Agreements provide for a prompt cure of any prepetition defaults and adequate assurances of future performance based on the ability of the three Debtors to reorganize. Id.   Popeyes has a contrary view.

///

Popeyes has responded to Pinnacle's motion to assume arguing that notwithstanding the relevant provisions of 11 U.S.C. § 365, Pinnacle cannot assume the Franchise Agreements without Popeyes' consent, and such consent will not be given. Doc. #245. Popeyes relies on § 365(c)(1) which, as interpreted in the Ninth Circuit, states that Popeyes' is excused from accepting performance or rendering performance to a hypothetical third party. Id. Because Pinnacle cannot assign the Franchise Agreements without Popeyes' consent due to the operation of certain provisions of both the Lanham Act and the 2015 amendments to CFRA, Pinnacle is also barred from assuming the Franchise Agreements. Id. This argument is derived from a legal concept indigenous to bankruptcy assignment and assumption issues known as "the hypothetical third party test" (or "the hypothetical test"), adopted by the Ninth Circuit in *Catapult Entertainment, Inc. v. Perlman (In Re Catapult Enter.)*, 165 F.3d 747 (9th Cir., 1999) and discussed more in depth below.

As alternative grounds for denying the motion, Popeyes asserts that Pinnacle has committed uncurable non-monetary defaults under the Franchise Agreements and has failed to cure undisputed monetary defaults, and thus, the motion to assume must be denied. Id. Pinnacle disputes that there is a non-monetary default at all. Pinnacle also contends it need not cure all monetary defaults.

In reply, Pinnacle presents arguments that CFRA contains provisions which defeat Popeyes' arguments under the hypothetical test. Doc. #260. Pinnacle also argues that it is in the process ///

of curing the various monetary defaults. Id.  Pinnacle's reply brief does not address Popeyes' Lanham Act arguments.

The instant motion and the opposition go to the very heart of this case.  If Pinnacle cannot assume the Franchise Agreements, there is essentially no business left to reorganize, except perhaps by a sale of the franchises.  Thus, the court will address the threshold legal issue, the *Catapult* test.  The parties have submitted their briefs and on October 8, 2024, the court heard arguments on this motion and took the matter under advisement.

## B.

The United States District Court for the Eastern District of California has jurisdiction of this matter under 11 U.S.C. § 1334(b) and referred this matter to this court under 28 U.S.C § 157(a).  This is the type of proceeding that a bankruptcy judge may finally determine under 28 U.S.C. § 157(b)(2)(A) and (O).

## II.

Pinnacle's motion to assume the Franchise Agreements is governed by 11 U.S.C. § 365(a), which permits the trustee (or as in this case the DIP) to "assume or reject any executory contract or unexpired lease of the debtor," subject to certain exceptions outlined elsewhere in § 365.  Franchise agreements that are not terminated pre-petition are almost universally deemed to be executory contracts subject to assumption or rejection.  *Sir Speedy, Inc. v. Morse*, 256 B.R. 657, 659 (D. Mass. 2000).  The parties here agree that the Franchise Agreements fall within the

type of agreements that are subject to § 365 if none of the

exceptions preclude assumption.

　　　Popeyes argues that Pinnacle cannot assume the Franchise

Agreements because of the operation of § 365(c)(1), which states:

> (c) The [DIP] may not assume or assign any executory
> contract or unexpired lease of the debtor, whether or
> not such contract or lease prohibits or restricts
> assignment of rights or delegation of duties, if—
>
> (1)
>
> (A) applicable law excuses a party, other than the
> debtor, to such contract or lease from accepting
> performance from or rendering performance to an entity
> other than the debtor or the debtor in possession,
> whether or not such contract or lease prohibits or
> restricts assignment of rights or delegation of duties;
> and
>
> (B) such party does not consent to such assumption or
> assignment[.]

11 U.S.C. § 365(c)(1).  Or restated: a debtor may neither assume

nor assign a contract if applicable law excuses a counterparty to

the contract from accepting performance from or rendering

performance to any entity other than the debtor unless the

counterparty consents to such assumption and/or assignment.

　　　While this language is seemingly straightforward, it has led

to two different theories of application: the "hypothetical test"

and the "actual test." Under the "hypothetical test," even if the

debtor merely wishes to assume an executory contract or an

unexpired lease and not assign its contract rights to a third

party, the counterparty may still withhold its consent and block

assumption if there is a hypothetical third party to whom the

debtor might assign its contract rights but as to whom the

counterparty would be excused from performing for under

applicable law. *In Re James Cable Partners*, 27 F.3d 534, 537 (11th Cir. 1994).[1] Under the "actual test," the counterparty would only be able to block assumption if there were an actual third party to whom the counterparty would be forced to accept performance other than the debtor with whom the counterparty had contract. *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 493 (1st Cir. 1997).[2]

     Proponents of the actual test argue that it better fulfills the intent of Congress in enacting § 365(c)(1) and is consistent with the Bankruptcy Code's reorganization policy. Proponents of the hypothetical test argue that it follows the actual written text of § 365(c)(1) which, despite arguments to the contrary, is unambiguous. *In re Catapult Entm't*, 165 F.3d 747, 749 (summarizing actual and hypothetical tests and joining circuits that apply the latter). As of this writing, it appears that the majority of the circuit courts of appeals to have considered the issue, including the Ninth Circuit, follow the hypothetical test and interpret § 365(c) to mean that "where 'applicable law' bars or excuses assignment of the underlying agreement, both assumption and assignment are prohibited." 3 Collier on Bankruptcy § 365.07. See *Catapult*, 165 F.3d at 749. "Applicable law" means any law applicable to the contract other than bankruptcy law. *In Re XMH Corp.*, 647 F.3d 690, 695 (7th Cir., 2011).

---

[1] In addition to the Eleventh and Ninth, the Third and Fourth Circuits have also adopted the "hypothetical test." See, *In re Sunterra*, 361 F.2d 257 (4th Cir. 2004); *In re W. Elec's. Inc.*, 852 F.2d 79 (3rd Cir. 1998).
[2] The Fifth Circuit also follows the "actual test" view. *In re Mirant*, 440 F.3d 238 (5th Cir., 2006).

The court acknowledges that the hypothetical test often has devastating effects on the ability of Chapter 11 debtors to reorganize, especially when a debtor franchisee depends upon maintenance of the franchise for any kind of reorganization. As stated in *In re Cumberland Corral, LLC*:

> In the present case, there is no dispute that the Franchise Agreements, by their terms, do not allow assignment without Golden Corral's consent. However, the Debtor has no intention of assigning the Franchise Agreements, and assumption would maintain the parties' relationship under the Franchise Agreements. In other words, allowing the Debtor to assume the Franchise Agreements is not forcing Golden Corral to accept performance from some unknown third party. Instead, assumption would maintain the parties' relationship under the Franchise Agreements.
>
> Under these circumstances, the Court is persuaded by the reasoning of those courts that have adopted the actual test. To allow Golden Corral to block assumption of the Franchise Agreements because such agreements could not be assigned would allow Golden Corral a windfall while destroying the Debtor's chances at reorganization. Such an outcome would be contrary to the purposes of the Bankruptcy Code.

*In re Cumberland Corral, LLC*, No. 313-06325, 2014 Bankr. LEXIS 936, at *23-25 (Bankr. M.D. Tenn. Mar. 11, 2014).[3]

Unfortunately for Pinnacle, the Ninth Circuit has spoken to this issue unambiguously in *Catapult*, and the court is obligated to apply the hypothetical test to this case.


                              III.

Under the *Catapult* hypothetical test, Popeyes can effectively block Pinnacle from assuming the Franchise Agreements if it can show that applicable law would excuse Popeyes from

---

[3] The Middle District of Tennessee is in the Sixth Circuit. The court has not been directed to any circuit authority in the Sixth Circuit adopting either the hypothetical or actual tests.

accepting performance from any hypothetical third party to whom
Pinnacle might theoretically assign its rights under the
Franchise Agreements post-assumption, regardless of the existence
of any actual such third party.  Popeyes has consistently
maintained in this case that it will not consent to assumption by
Pinnacle effectively blocking Pinnacle's assumption of the
Franchise Agreements under § 365(c)(1)(A) and (B).  Popeyes has
stated they have suggested to Pinnacle some approved successors
to Pinnacle's franchises.

The specific "applicable law" within the meaning of
§ 365(c)(1) are the Lanham Act and CFRA.  We will examine each.


A.   The Lanham Act.

Popeyes argues that the Franchise Agreements all require use
of a trademark.  Pinnacle concedes that.  But the analysis of
whether the Lanham Act is an "applicable law" that preserves
Popeyes' right to refuse consent to Pinnacle's assumption
requires examination of the application of the Lanham Act in the
context of executory contract assumption.

> Federal trademark law is governed by 15 U.S.C. §§ et
> seq., referred to colloquially as "the Lanham Act."
>
> Trademark rights are intangible property rights because
> their primary feature and value are consumers'
> perceptions of the mark.  Trademarks are valuable
> property rights that allow their owners to protect the
> good will of their name and products by preventing
> unwarranted interference and use of their mark by
> others.  As a grant of permission to use another's
> mark, the trademark owner has a significant interest in
> controlling to whom the mark is transferred because the
> subsequent value of the trademark will be based
> entirely on good will.  Good will and trademarks "go
> hand in hand, at least to the extent that an attempted
> transfer of a trademark is void without transfer of the
> good will associated with the trademark." Indeed, the

Lanham Act provides that "a registered mark…shall be assignable with the good will of a business in which the mark is used." The trademark owner not only has a right to assign a trademark, but the same owner also maintains a right and duty to control the quality of goods sold under the mark. 15 U.S.C. § 1060.  Because the owner of the trademark has an interest in the party to whom the trademark is assigned so that it can maintain the good will, quality, and value of its products and thereby its trademark, trademark rights are personal to the assignee and not freely assignable to a third party.

*N.C.P. Mktg. Grp. v. Blanks (In re N.C.P. Mktg. Grp.)*, 337 B.R. 230, 236 (D. Nev. 2005), aff'd 279 Fed. Appx. 561 (9th Cir. 2008), cert. denied, 556 U.S. 1145 (2009)(internal citations omitted). See also *Miller v. Glenn Miller Productions*, 318 F.Supp.2d 923, 928 (C.D. Cal. 2004)(holding that trademark licensors have an ownership interest in their marks that would be "severely diminished if a licensee were allowed to sub-license without the licensor's permission"); *XMH Corp.*, 647 F.3d at 695. ("The universal rule is that trademark licenses are not assignable in the absence of a clause in the contract expressly authorizing the assignment.")  J. Thomas McCarthy, 4 <u>McCarthy on Trademarks and Unfair Competition</u> § 14.22 (4th ed. 2005)("[S]ince the licensor-trademark owner has the duty to control the quality of goods sold under its mark, it must have the right to pass upon the abilities of new potential licensees.")

1.  *Pinnacle's Lanham Act Arguments*.

Pinnacle's arguments on the Lanham Act issue are minimal. To the extent that the topic is addressed, Pinnacle appears to suggest that CFRA trumps federal law on the issue of trademarks as part of the bundle of rights conveyed through Franchise

Agreements and thus, by extension, trumps the plain language of § 365(c)(1). Doc. #226 (Debtor's Motion at pg. 8); Doc. #260 (Debtor's Reply Brief at pg. 6). Pinnacle argues that assignment of trademarks is primarily an issue of state law. That may be true.[4] Pinnacle's cited cases do not support its contention that § 365(f) controls.

*In Orion Pictures Co. v. Showtime Networks (In re Orion Pictures Co.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) the issue before the Second Circuit was whether the bankruptcy court erred in resolving a disputed issue of fact between parties to a contract in the context of deciding whether to grant a motion to assume that contract. The question of whether the opposing party could defeat the motion to assume altogether under § 365(c)(1) was not an issue before the court.

Pinnacle cites *Georgia Ports Auth. V. Diamond Mfg. Co. (In re Diamond Mfg. Co.)*, 164 B.R 189, 199 (Bankr. S.D. Ga. 1994) for an explanation of how the burden of proof shifts in deciding issues pertaining to a motion to assume or assign, with the debtor bearing the initial burden of proof (1) that a contract is subject to assumption and (2) that all § 365 requirements have been met. If the debtor meets those requirements, the burden shifts to non-debtor counterparty to provide evidence of defaults and, upon doing so, back to the debtor to prove adequate "cure" of those defaults. *Diamond Mfg. Co.* 164 B.R. at 199. However, § 365(c)(1) was not an issue in that case and was not addressed by the court.

---

[4] The Lanham Act does not preempt all aspects of franchise law. See, 15 U.S.C. § 1127; *Marinello v. Shell Oil*, 511 F.2d 853 (3rd Cir. 1975).

Pinnacle also acknowledges the applicability of *Catapult* to this motion but argues that it should be read "narrowly because *Catapult* requires that 'applicable law' preclude assignment before § 365(c)(1) applies." Doc. 226. Pinnacle argues that the only "applicable law" that is relevant to the court's analysis is CFRA which encourages assignment. Id.

Finally, in its reply brief, Pinnacle also cites *Tap Publications, Inc. v. Chinese Yellow Pages*, (925 F.Supp. 212, 217 (S.D.N.Y. 1996)) for the proposition that "state contract law governs the assignment of a trademark license." Doc. #260. That is, frankly, a misreading of the facts and holding of *Tap Publications*. In that case, the plaintiff-corporation ("Tap") brought Lanham Act claims and other claims against a trademark holder ("ASM") under the theory that ASM had contractually given a right to use the mark in question to a third party ("Key"), who in turn transferred that right to Tap. *Tap Publ'ns*, 925 F. Supp. at 215-16. The court held that Tap's claims were not Lanham Act claims but simply state contract law claims, because the question of whether any trademark rights had been validly assigned was one of contract interpretation, and the court concluded that no such evidence of a valid assignment via contract existed. Id. at 218.

Though the court agrees with the general principle that the validity of an assignment of trademark rights via contract is typically a matter of state law contract interpretation, that is irrelevant to the § 365(c)(1) analysis because, under the hypothetical test, there is no contract between the debtor and any third party to be considered, hence the use of the word

///

"hypothetical." Indeed, elsewhere in *Tap Publications*, the court

notes that:

> The right of a licensee to sub-license to others must
> be determined by whether the license clearly grants
> such a power.  Similarly, the general rule is that
> unless the license states otherwise, the licensee's
> right to use the licensed mark is personal and cannot
> be assigned to another.

Id. (citing 2 <u>McCarthy on Trademarks and Unfair Competition</u>

§ 18.13[2](3d ed. 1996).


2.    *Popeyes' Lanham Act Arguments.*

        In response to Pinnacle, Popeyes' argues that, in the

context of Franchise Agreements and trademark licenses, the

"applicable law" which triggers § 365(c)(1)'s restriction on

assumption and assignment is the Lanham Act:

> In particular, the Lanham Act provides that a
> registrant of a mark registered in the Patent and
> Trademark Office is entitled to nationwide trademark
> protection. 15 U.S.C. § 1072. *In re The Travelot Co.*,
> 286 B.R. 447, 454-455 (Bankr. S.D. Ga. 2002).  The
> Lanham Act defines a trademark, in part, as "any word,
> name, symbol, or device, or any combination thereof . .
> . used by a person . . . to identify and distinguish
> his or her goods, including a unique product, from
> those manufactured or sold by others and to indicate
> the source of the goods, even if that source is
> unknown." 15 U.S.C. § 1127. Moreover, the Lanham Act
> prevents the unauthorized use or transfer of a
> federally registered trademark. For example, it: (a)
> authorizes a registrant to sue and obtain injunctive
> relief against the non-consensual use of trademark, 15
> U.S.C. § 1116; (b) provides that "[a]ny person who
> shall, without the consent of the registrant . . . use
> in commerce any reproduction . . . of a registered mark
> in connection with the sale . . . of any goods . . .
> shall be liable in a civil action", 15 U.S.C. § 1114;
> and (c) provides that "[a]ny person who . . . uses in
> commerce any word, term, name, symbol, or device . . .
> which . . . is likely to cause confusion, or to cause
> mistake, or to deceive as to the affiliation,
> connection, or association of such person with another
> person, or as to the origin, sponsorship, or approval

of his or her goods, services or commercial activities
by another person . . . . shall be liable in a civil
action . . . ." 15 U.S.C. § 1125.

Doc. #245 at n.7. Popeyes cites a number of cases which identify
the Lanham Act as the relevant "applicable law" that triggers
§ 365(c)(1) in cases involving assumption of Franchise agreements
and trademark licenses, though only one of those cases, *In re
N.C.P. Mktg. Group Inc.*, 337 B.R. at 235-237 is a Ninth Circuit
case. (Nevada District Court extending reasoning of *Catapult* to
federal trademark claims). In that case, the court stated:

> Indeed, the Lanham Act provides that "a registered
> mark…shall be assignable with the good will of a
> business in which the mark is used." The trademark
> owner not only has a right to assign a trademark, but
> the same owner also maintains a right and duty to
> control the quality of goods sold under the mark. 15
> U.S.C. § 1060 . Because the owner of the trademark has
> an interest in the party to whom the trademark is
> assigned so that it can maintain the good will,
> quality, and value of its products and thereby its
> trademark, trademark rights are personal to the
> assignee and not freely assignable to a third party.
> J. Thomas McCarthy, 4 *McCarthy on Trademarks and Unfair
> Competition* § 25.33 (4th ed. 2005) ("since the
> licensor-trademark owner has the duty to control the
> quality of goods sold under its mark, it must have the
> right to pass upon the abilities of new potential
> licensees.").

Id. at 236. While there is no controlling authority in the Ninth
Circuit on the issue of applying federal trademark law as
"applicable law" in the context of § 365(c)(1), the court finds
*N.C.P. Mkt. Group* to be persuasive authority and finds that
Popeyes' rights under the Lanham Act represent "applicable law"
that excuses Popeyes from accepting performance from or rendering
performance to an entity other than Pinnacle under § 365(c)(1).
Thus, *Catapult* compels the conclusion that Pinnacle can neither

assign nor assume the Franchise agreements without Popeyes'
consent.

B.    CFRA.

Pinnacle is largely reluctant to engage with the Lanham Act because it insists that CFRA controls and, for a variety of reasons, effectively trumps Popeyes' rights under § 365(c)(1) . In its motion, Pinnacle argues that CFRA is the only "applicable law" that matters and it encourages assignment. Doc. #226.  The relevant provisions of CFRA are found in § 20028(a)-(b):

> (a)  It is unlawful for a franchisor to prevent a franchisee from selling or transferring a franchise, all or substantially all of the assets of the franchise business, or a controlling or noncontrolling interest in the franchise business, to another person **provided that the person is qualified under the franchisor's then-existing standards for the approval of new or renewing franchisees,** these standards to be made available to the franchisee, as provided in Section 20029, and to be consistently applied to similarly situated franchisees operating within the franchise brand, and the franchisee and the buyer, transferee, or assignee comply with the transfer conditions specified in the franchise agreement.

> (b)  **Notwithstanding subdivision (a), a franchisee shall not have the right to sell, transfer, or assign the franchise, all or substantially all of the assets of the franchise business, or a controlling or noncontrolling interest in the franchise business, without the written consent of the franchisor, except that the consent shall not be withheld unless the buyer, transferee, or assignee does not meet the standards for new or renewing franchisees described in subdivision** (a) or the franchisee and the buyer, transferee, or assignee do not comply with the transfer conditions specified in the franchise agreement.

Cal. Bus. & Prof. Code § 20028 *emphasis added*.  Pinnacle interprets this language as follows:

> The statute provides that the franchise is transferrable and assignable to a proper transferee over the objection of a franchisor as a matter of state

> law and that under such circumstances, transfer or
> assignment may be compelled by a court. The statute
> provides that it is unlawful for the franchisor to
> prevent such a transfer or assignment; accordingly,
> there is a limitation on assignability or sale, but no
> prohibition as required by Section 365(c)(1).

Doc. #171  (Debtor's Opposition to Popeyes' Motion to Remove Debtor from Possession, incorporated by reference in Doc. #226).

Unsurprisingly, Popeyes disagrees with Pinnacle's interpretation of CFRA. Doc. #245.  Reading the same statutory language as quoted above, Popeyes interprets it to mean that

> [w]hile CFRA provides that a franchisor cannot reject a
> sale or transfer of a franchise agreement provided that
> the proposed buyer otherwise qualifies under its
> standards and meets other requirements, the statute is
> equally clear that a franchisor can reject any such
> proposed sale or transfer if the buyer does not qualify
> under its standards.[5]

Id.  Because the hypothetical test looks to the existence of a hypothetical assignee to the Franchise Agreements for which Popeyes would be excused from either accepting or rendering performance under the Franchise Agreements, that necessarily includes hypothetical assignees who do not qualify under Popeyes' standards for approval of new or renewing franchises.  Thus, Popeyes argues, Pinnacle fails the hypothetical test under CFRA as well.

---

[5] Popeyes also argues that since the relevant provisions of CFRA were adopted by the California legislature and signed by the governor in 2015 and effective January 1, 2016, the provisions of CFRA do not apply.  Popeyes theory is all but two of the franchise contracts between Popeyes and Pinnacle were entered into before 2016.  Pinnacle's predecessor entered into those contracts in 2013.  The court rejects the argument.  True enough, 2015 amendments effective January 1, 2016 do apply only to agreements entered into or renewed on or after January 1, 2016.  Cal. Bus. & Prof. Code § 20041(b).  The pre-2016 contracts were "assigned" to Pinnacle.  New contracts were not entered into. But under Cal. Bus. & Prof. Code § 20010 (in effect since January 1981) any condition, stipulation or provision purporting to bind any person to waive compliance with any provision of [CFRA] is contrary to public policy and void.

The parties also make much of a semantic distinction. Pinnacle argues that *Catapult* must be read narrowly in light of CFRA and the court must find that the applicable law "precludes" assignment before § 365(c)(1) applies. Doc. #226.  Popeyes' objects to the idea that the applicable law must "preclude" assignment and notes that the Code merely says that the applicable law must "excuse" Popeyes from accepting or rendering performance. Doc. #245.  The court finds this distinction to be of little importance.  Under § 365(c)(1), assignment may be "precluded" whenever the applicable law "excuses" performance and the counterparty does not consent to assignment.

At oral argument, Pinnacle's counsel stressed one passage of *Catapult* as being dispositive of the issue here.  The *Catapult* court recognized the difficulty reconciling 11 U.S.C. § 365(f)(1) and (2), "superiority" to any applicable law's prohibitions, restrictions, or conditions on a contract assignment and noted that a trustee (or DIP as here) may assign the contract if it is assumed and adequate assurance of future performance is provided. 165 F.3d at 751-52.  The court reconciled the exception to this broad rule under § 365(c)(1) by explaining:

> Only if the law prohibits assignment on the rationale that the identity of the contracting party is material to the agreement will subsection (c)(1) rescue it.

*Catapult*, 165 F.3d at 751-52.

One case cited by Pinnacle's counsel in argument was cited by the Ninth Circuit as supporting the above.  *In re Antonelli*, 148 B.R. 443, 448 (D. Md. 1992).  On an appeal from the bankruptcy court order confirming a Chapter 11 Plan, the district court there affirmed the bankruptcy court.  *Id.* at 450.

Appellants who were partners of Antonelli argued that § 365(c)
precluded confirmation because under controlling Maryland
Partnership Law, the assignment of a partner's interest does not
give the assignee any more rights than the value of the
partnership interest.  The plan in *Antonelli* required Antonelli's
partnership decisions to be screened by a post-confirmation
liquidation committee.  There, the District Court framed the
issue as:  "the non-debtor party to a contract is excused from
performance if the identity of the debtor is a material condition
of the contract when considered in the context of the obligations
which remain to be performed under the contract."  *Id.* at 448.

The *Antonelli* court then went on to analyze the practical
facts before it in that case.  *Id.* at 449.   The partnerships
involved there were mature real estate ventures with little
active partner participation required and a property manager for
the properties was handling day-to-day decisions.  *Id.*  The court
noted certain partnerships may be at a stage where a partner's
identity is more important.  *Id.* at 449.   The *Antonelli* court
mentioned the bankruptcy court's finding about the liquidating
committee's interests and concluded that the adequate assurance
of future performance required by § 365(f)(2)(B) were satisfied.
*Id.* at 450.

A franchisor such as Popeyes here, has rigorous standards
that a potential franchisee must meet before being awarded a
franchise.  By definition, then, the identity of the franchisee
is material to the franchise contract.  The franchises here are
ongoing quick service restaurants in two metropolitan locations.
A franchisor's standards and requirements are material to the

franchise.  Thus, here the exception of § 365(c) to the general permissible assignments under § 365(f) apply.  *Catapult*. Applicable law excuses Popeyes from accepting performance from a party other than the Debtor.  The identity of a franchisee is material to the franchise contract so the contracts here are "rescued" under § 365(c).

Pinnacle directs the court's attention to *In re Van Ness Auto Plaza, Inc.*, 120 B.R. 545 (Bankr. N.D. Cal. 1990) which Pinnacle concedes is both a pre-*Catapult* and a pre-CFRA case. Doc. #260.  In that case, the bankruptcy judge noted that, under California state law as it existed at the time, a counterparty under § 365(c)(1) could not "unreasonably" withhold consent. *Van Ness*, 120 B.R. at 546.  The court went on to find that the counterparty (Porsche) reasonably withheld consent to the transfer. Id.

*Van Ness* is not controlling here.  The relevant law in *Van Ness* was the California Vehicle Code, and the franchise to be assigned was a Porsche dealership. Id.  The circumstances of potentially assigning an auto dealership are qualitatively different than assigning a franchise in a nationally-recognized fast food restaurant with its own trademarks, distinctive trade dress, and goodwill.  More importantly, in *Van Ness*, there was an actual assignee involved, and Porsche could point to specific grounds why its refusal to consent to the assignment was reasonable.  In other words, the operation of the Ninth Circuit's hypothetical test was avoided completely.

Finally, Popeyes cites to the only case that the court is aware interprets CFRA (or at least § 20028(b)) since this fairly

new statute was enacted: *Prieto Auto., Inc. v. Volvo Car USA, LLC* ("*Prieto*"), No. 1:21-cv-01085-KES-EPG, 2024 U.S. Dist. LEXIS 106230, at *34 (E.D. Cal. June 13, 2024). While the facts are rather different (another car dealership) and the case was not a bankruptcy case which implicated § 365(c)(1), the *Prieto* court stated that CFRA "makes clear that a franchisee 'shall not have the right to sell' the franchise without the franchisor's written consent . *Prieto*, No. 1:21-cv-01085-KES-EPG, 2024 U.S. Dist. LEXIS 106230, at *33. Because of the posture of the *Prieto* case, the issue of whether any denial of consent must be reasonable was not before the court.

The court agrees with Popeyes' analysis of CFRA and its implications for § 365(c)(1). Regardless of whether CFRA favors transfer or assignability of franchises, the relevant question in this case is the one raised by *Catapult*: Is there a hypothetical third party to whom Pinnacle might be excused from accepting or rendering performance because such a hypothetical third party might not qualify for Popeyes standards for approval under CFRA? The answer is yes. Accordingly, CFRA provides alternative grounds for concluding that Pinnacle fails the *Catapult* hypothetical test and cannot assume the Franchise Agreements if Popeyes continues to withhold consent.

## CONCLUSION

Based on the foregoing analysis, the court finds that Pinnacle has failed to meet its burden under the *Catapult* hypothetical test. Accordingly, the motion to assume the Franchise Agreements must be **DENIED**.

The court is cognizant of the fact that this interpretation of the hypothetical test in the context of franchise agreements may present serious difficulties for franchisees who wish to reorganize under bankruptcy law.  After all, the court expects that, for most franchisee business, the franchise agreements are the business.  Accordingly, the application of the hypothetical test, in many situations, may give veto power over the possibility of effective reorganization to the franchisor, who may also be a hostile creditor.  Unfortunately, *dura lex sed lex* -- The law is hard, but it is the law.

The court notes that Popeyes has submitted additional grounds for denying the motion based on what it purports to be "incurable non-monetary defaults" and monetary defaults on the part of Pinnacle.  Because these are fact-intensive, the court declines to consider them in light of the gateway application of the *Catapult* test.

A separate order will issue.


**Dated:** Oct 10, 2024                    **By the Court**

René Lastreto II, Judge
**United States Bankruptcy Court**

**Instructions to Clerk of Court**
**Service List - Not Part of Order/Judgment**

     The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below.  The Clerk of Court will send the Order via the BNC or, if checked ___, via the U.S. mail.

Pinnacle Foods of California LLC
764 P. St., Ste. 105
Fresno, CA 93721

Walter R. Dahl
8757 Auburn Folsom Rd #2820
Granite Bay, CA 95746-2820

Office of the U.S. Trustee
United States Courthouse
2500 Tulare Street, Room 1401
Fresno, CA 93721

Michael Jay Berger
Law Office of Michael J. Berger
9454 Wilshire Blvd 6th Fl
Beverly Hills, CA 90212-2929

Keith C. Owens
Fox Rothschild LLP
10250 Constellation Blvd.
Ste 900
Los Angeles, CA 90067

Craig R. Tractenberg
Fox Rothschild LLP
2000 Market St. 20 Floor
Philadelphia, PA 19103

Glenn Moses
Venable LLP
801 Brickell Avenue, Suite 1500
Miami FL 33131